Appellate Tax Board
Commonwealth of Massachusetts

*1 THE NEIMAN MARCUS GROUP, INC.
v.
COMMISSIONER OF REVENUE
Docket No. F245638
January 24, 2001

This is an appeal under the formal procedure pursuant to G.L. c. 62C, § 39, from the refusal of the appellee to abate sales taxes assessed against the appellant under G.L. c. 64H, § 2.

Commissioner Gorton heard the appeal and was joined in the decision for the appellant by Chairman Burns and Commissioners Scharaffa and Egan.

These findings of fact and report are made at the requests of the appellant and the appellee pursuant to G.L. c. 58A, § 13 and 831 CMR 1.32.

John S. Brown, Esq., George P. Mair, Esq. Donald-Bruce Abrams, Esq., Darcy A. Ryding, Esq. and Matthew D. Schnall, Esq.
for the appellant

Kevin Dailey, Esq. and Timothy Stille, Esq.
for the appellee

## FINDINGS OF FACT AND REPORT

On the basis of a Stipulation of Agreed Facts, a Supplemental Stipulation of Agreed Facts, and testimony and exhibits introduced in the hearing of this appeal, the Appellate Tax Board ("Board") made the following findings of fact. The appellant, The Neiman Marcus Group, Inc. ("Neiman Marcus") is a Delaware corporation with its principal executive office at 27 Boylston Street, Chestnut Hill, Massachusetts and its operating and buying departments based in Dallas, Texas. Neiman Marcus sells premium apparel and other consumer goods through its retail stores. During the quarterly periods ending September 30, 1991 through June 30, 1994 (the "periods at issue"), Neiman Marcus maintained one retail store in Massachusetts, at 5 Copley Place in Boston.

As a vendor of upscale merchandise, Neiman Marcus upholds a rigorous standard of customer service and satisfaction. Neiman Marcus espouses a strict philosophy that "the customer is always right" and is to be accomodated with """hassle-free service" in every situation. Neiman Marcus trains its entire staff in keeping with this philosophy, and its customers have thus come to expect this superior level of service. Neiman Marcus also seeks to develop lasting relationships with its customers by providing exceptional customer service and incentive programs, analogous to airline frequent-flyer mileage programs, that reward customers for the amount of purchases they make.

Neiman Marcus does not enter into formal, integrated and written contracts of sale with its customers. The only written record of a sales transaction is the receipt that is printed and given to the customer after the sales information is input into a computerized register and the customer's payment is processed. The receipt lists the items purchased, their prices, the applicable shipping and handling charges and any applicable sales taxes, as well as collateral information such as customer and recipient information, dates, and codes identifying the Neiman Marcus store, sales associate, register and transaction numbers.

A Neiman Marcus sales receipt does not state other terms or conditions of sale, limitations on liability or similar restrictions. Nor does the sales receipt purport to be an integrated contract of sale. Neiman Marcus does not otherwise limit or qualify its responsibilities to its customers. Consequently, much of the applicable transaction contract arises in accordance with Neiman Marcus's custom and practice in dealing with its customers.

*2 The transactions at issue involve retail sales to customers who purchased merchandise from Neiman Marcus while physically present at its Boston store, but requested delivery of the merchandise to a third-party designee at a location outside Massachusetts. Neiman Marcus classified such sales as "send transactions" on its internal records. In processing these sales, the sales associate would further ask the customer whether the merchandise was being sent as a gift. If the purchase was a gift transaction, Neiman Marcus would typically undertake to gift-wrap the item and enclose a gift card and special enclosures that identify the gift but not its price. Neiman Marcus identified these purchases on its internal records as "gift-send transactions."

All sales for out-of-state delivery ("send" and "gift-send transactions") included a separately-stated charge for shipping and handling services on the printed receipts. The practice of Neiman Marcus was to select and deal directly with a common carrier who conveyed the merchandise to the out-of-state recipient. Neiman Marcus set the amount of the

delivery charge without simply passing through the amount it was charged by the carrier. The shipping and handling charge was related to the method of shipping (surface or air delivery), the estimated weight of the merchandise and the requested destination, but not intended to capture the exact cost to Neiman Marcus.

The carrier invoiced Neiman Marcus directly, and Neiman Marcus assumed all responsibility for lost or damaged shipments, electing to self-insure rather than pay a fee to the carrier for insurance. If a package was lost or damaged, the Neiman Marcus customer did not deal with the carrier directly. Instead, as part of its custom and practice of "hassle-free service," Neiman Marcus simply and unconditionally allowed the customer to choose between a refund or a replacement of the merchandise.

Kenneth C. Dunbar, the Sales Support Manager for Neiman Marcus's Boston store, testified, and the Board found, that Neiman Marcus customers understood that they would have no liability or risk of loss for damaged or lost merchandise which they purchased for out-of-state delivery. For that reason, Neiman Marcus's sales associates did not offer or sell insurance to its customers, either directly or through third-party carriers. Any costs of damaged or lost shipped merchandise in excess of a carrier's $100 liability limit were borne directly and ultimately by Neiman Marcus. Mr. Dunbar also testified that Neiman Marcus's assumption of the responsibility for risk of loss was consistent with the practice of other high-end retailers that compete with Neiman Marcus.

Based on all the evidence above, the Board found that Neiman Marcus was obligated under send and gift-send transaction contracts to deliver the merchandise to an out-of-state destination and designee. Moreover, Neiman Marcus assumed responsibility for the merchandise until it was actually delivered to the destination and recipient requested by the purchaser. The risk of loss prior to the agreed-upon out-of-state delivery reaching the designated destination and recipient lay squarely with Neiman Marcus.

*3 In the case of a send transaction to an out-of-state recipient that was not a gift-send transaction, Neiman Marcus did not collect or remit a Massachusetts sales tax. However, if Neiman Marcus had a retail store in the state to which the merchandise was being shipped, it collected and remitted the sales tax imposed by that jurisdiction. In the case of a gift-send transaction, Neiman Marcus collected and paid a Massachusetts sales tax if the merchandise was not otherwise exempt from Massachusetts sales tax. Consistent with these practices, Neiman Marcus's Associate Vice President for Taxes, Scott Sharek, testified that Neiman Marcus collected and remitted sales taxes to Massachusetts on non-exempt send transactions, other than gift-send transactions, involving shipments of merchandise into Massachusetts from out-of-state stores. During the periods at issue, Neiman Marcus collected and remitted Massachusetts sales taxes in excess of $100,000 with respect to such send transactions originating at stores outside of Massachusetts.

Neiman Marcus timely filed a Massachusetts sales and use tax return for each of the periods at issue and timely paid the taxes shown as due thereon. Neiman Marcus and the Commissioner of Revenue (the "Commissioner") executed a series of agreements to extend the period of limitations for assessments on sales and use taxes for the periods at issue. On audit of Neiman Marcus's returns, the Commissioner assessed additional sales taxes on the send transactions for which Neiman Marcus had not charged a sales tax and which were not otherwise exempt. The Commissioner made no corresponding adjustment of Massachusetts sales taxes in favor of Neiman Marcus with respect to sales tax paid on send transactions originating at stores outside of Massachusetts where merchandise was delivered into Massachusetts.

The Commissioner issued Neiman Marcus a notice of intention to assess ("NIA") dated March 9, 1996 with respect to all periods at issue. The Commissioner issued revised NIAs with respect to the periods at issue on May 24, 1996 and September 5, 1996. The Commissioner's Appeal & Review Bureau issued to Neiman Marcus a letter of final determination with respect to its sales and use taxes on November 14, 1996. The Commissioner subsequently issued to Neiman Marcus a notice of assessment dated November 21, 1996 ("NOA") for all periods at issue.

On January 5, 1997, Neiman Marcus timely paid in full the assessments reflected in the NOA, together with all accrued interest and penalties. On March 31, 1997, Neiman Marcus filed an application for abatement requesting an abatement of the additional sales taxes on send transactions it paid pursuant to the NOA, as well as an abatement of the sales tax it believed it mistakenly collected and remitted on gift-send transactions for the periods at issue. The Commissioner issued a notice of abatement denial dated August 21, 1997, notifying Neiman Marcus that its abatement application had been denied in full. On October 17, 1997, Neiman Marcus filed its petition with the Board appealing the Commissioner's refusal to grant the abatements requested. On this basis, the Board found it had jurisdiction over this appeal.

*4 For the reasons stated in the Opinion which follows, the Board found that Neiman Marcus was not subject to Massachusetts sales taxes on the send or gift-send transactions destined for third-party recipients located outside Massachusetts. Accordingly, the Board issued a decision for the appellant in this appeal and granted an abatement of tax in the amount of $142,714.47, plus all statutory additions.

## OPINION

The Massachusetts sales tax is imposed on sales at retail which occur "in the commonwealth." G.L. c. 64H, § 2. Both Neiman Marcus and the Commissioner agreed that a sale of tangible personal property occurs "in the commonwealth," and is thus subject to the Massachusetts sales tax, if either title to or possession of the property passes to the purchaser or the purchaser's designee in Massachusetts. See G.L. c. 64H, § 1 (definition of "sale"), 830 CMR 64H.6.7(2) (definition of "sale") and 830 CMR 64H.6.7(3)(a) (general rules of taxability of sales for delivery out of state). Conversely, sales of tangible personal property for delivery outside of the Commonwealth will not be subject to Massachusetts sales tax if neither title nor possession of the property passes to the purchaser or the purchaser's designee within the

Commonwealth. 830 CMR 6.7(3)(a)(5). See generally, The Anthony Galluzzo Corp. v. Commissioner of Revenue, 21 Mass.App.Tax Bd.Rep. 72, 77 (1997).

The issue in this appeal is whether Neiman Marcus was required to collect Massachusetts sales taxes on the sales of tangible personal property for out-of-state delivery to a purchaser's designee. Transfer of possession will not supply a basis for the imposition of the Massachusetts sales tax. It is clear that possession of the property passed to the recipient outside of Massachusetts, since the purchaser never took possession in Massachusetts and the property was delivered to the designee outside of Massachusetts. Accordingly, determination of whether these transactions are subject to Massachusetts sales or use tax depends on whether title to the property sold passed inside or outside of the Commonwealth.

The determination of passage of title is made according to application of the Uniform Commercial Code (the "UCC"), incorporated into the General Laws as chapter 106. See 830 CMR 64H.6.7(3)(a)(5) (passage of title rules). See also Lawrence-Lynch Corp. v. Commissioner of Revenue, 22 Mass.App.Tax Bd.Rep. 245, 256-57 (1997); New England Homes, Inc. v. Commissioner of Revenue, 10 Mass.App.Tax Bd.Rep. 95, 99 (1988). The UCC provides that, "[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods." G.L. c. 106, § 2-401(2). Whether the seller has completed his performance depends in turn upon whether the contract for sale requires the seller to tender "delivery at destination" under § 2-401(2)(b) (the "delivery contract") or whether it merely "requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination" under § 2-401(2)(a) (the "shipment contract"). As a result, the taxability of the sales for out-of-state delivery, both the send and gift-send transactions, depended on whether Neiman Marcus was required to deliver the goods to their destinations and designated recipients.

*5 Neiman Marcus's obligations with respect to delivery of the goods would arise from the contracts of sale entered into between Neiman Marcus and its customers. See G.L. c. 106, § 2-401(2). The UCC defines a "contract" as "the total legal obligation which results from the parties' agreement." G.L. c. 106, § 1-201(11). The UCC further defines an "agreement" as "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this chapter." Id. at § 1-201(3) (emphasis added). See also G.L. c. 106, § 1-205, Comment 1 ("the meaning of the agreement of the parties is to be determined by the language used by them and by their action, read and interpreted in light of commercial practices and other surrounding circumstances").

"Course of dealing" is defined as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Id. at § 1-205(1). "Usage of trade" is defined as "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." Id. at § 1-205(2). The existence and scope of such usage of trade is to be proven as a matter of fact. Id.

Based on the foregoing, the Board found that Neiman Marcus produced credible and persuasive evidence establishing a course of performance and usage of trade which supported the conclusion that Neiman Marcus's agreement with its customer included a responsibility for it to tender the goods at the destination designated by the customer. Furthermore, the Board found that Neiman Marcus assumed complete responsibility for all merchandise until it actually reached the destination and recipient named by the purchaser.

Neiman Marcus sought repeat business from its customers by offering frequent-shopping incentives and its "hassle-free service" policy whereby "the customer is always right." Such "hassle-free service" was evident in the manner by which Neiman Marcus assumed complete responsibility for the loss or damage to merchandise which was delivered by the independent carriers. Neiman Marcus alone dealt with the carrier, and offered the customer an unconditional, no-questions-asked choice between a refund or replacement if the customer reported that the merchandise was lost or damaged in transit. Moreover, Neiman Marcus insured the goods itself and undertook to refund or replace all lost or damaged merchandise from send or gift-send transactions, at its own expense. Given these factors, the Board found that "a sequence of previous conduct between the parties" existed between Neiman Marcus and its customers "establishing a common basis of understanding for interpreting" Neiman Marcus's obligations as a matter of contract. In its undertaking to assure the delivery of goods at destination, a course of dealing arose to this effect.

*6 The Board thus found that, given the entire agreement between the parties, which included the course of dealing and usage of trade as described above, Neiman Marcus met its burden of proving that the transaction between the parties created a "delivery contract" requiring Neiman Marcus to deliver the goods to their destination pursuant to § 2-401(2)(b). See Droukas v. Divers Training Academy, Inc., 375 Mass. 149, 157-59 (1978) (a contract is ordinarily interpreted as a "shipping contract" where it is silent as to delivery, unless "'"the commercial understanding of the terms used by the parties contemplates such delivery"), quoting G.L. c. 106, § 2-503, Comment 5. Because Neiman Marcus's contract performance required it to effect delivery of goods at their final destination, and such responsibility was understood and expected by their customers, title did not pass until the goods were in fact tendered at their destination. See Mechanics National Bank of Worcester v. Gaucher, 7 Mass. App. Ct. 143, 147 (1979) (title passes to the buyer at the time and place at which the seller completes his performance with respect to physical delivery of the goods at their destination). Therefore, the sales for out-of-state delivery, including both the send and gift-send transactions, were not subject to Massachusetts sales tax, because title did not pass within the Commonwealth.

Other states have reached the same result given similar factual circumstances. See, e.g., May Department Stores Company v. Director of Revenue, 748 S.W.2d 174 (Mo. 1988) (title did not pass under UCC until delivery was completed outside the state), and C.G. Gunther's Sons v. McGoldrick, 255 A.D. 139, aff'd per curiam, 18 N.E.2d 12 (NY 1938) (sales

were not consummated in New York City, and thus not subject to city's sales tax, where sales contracts """expressly in some cases and otherwise by implication or by the usages of the trade, required delivery by the seller at his own expense"); cf. George S. Carrington Co. v. State Tax Commission, Docket No. 73737 (July 26, 1977), aff'd, 375 Mass. 549 (1978) (seller's performance of its obligations terminated within Massachusetts, and therefore title passed in Massachusetts, when buyers assumed the responsibility for delivery by specifically instructing the seller to use their mailing permits in order to effect the delivery).

The Commissioner cited the regulation at 830 CMR 64H.6.7(3)(a)(5) to contend that the send and gift-send transactions were taxable in Massachusetts. However, this regulation, read in a manner consistent with Massachusetts law, buttresses the conclusion that no Massachusetts sales tax fell on the send and gift-send transactions. The regulation summarizes the rules related to the passage of title when "the vendor is obligated by an agreement to deliver the property to the purchaser's designee outside Massachusetts and the purchaser is within Massachusetts when the order for the property is placed." Under these conditions, title passes "in accordance with the terms of the contract." If the contract is "silent on passage of title," then title passes in one of two ways: (i) "title passes in Massachusetts when the property is delivered to an interstate carrier for redelivery to the purchaser's designee," or (ii) "if the property is to be delivered to the designee by the dealer (for example, in the dealer's own truck), title will not pass until delivery is completed. Under this circumstance, there is no sale in Massachusetts, and no sales tax is imposed." 830 CMR 64H.6.7(3)(a)(5)(b)(i)&(ii).

*7 The Commissioner interpreted this regulation, in particular subparagraph (ii), as providing that in all situations where a dealer, such as Neiman Marcus, delivered goods to a common carrier for redelivery to the purchaser's out-of-state designee, then title passed within Massachusetts. The transaction under this view would invariably be taxable unless the seller used its own truck to make the delivery.

The Commissioner's position does not square with the plain language of the regulation, however, read in light of the UCC. The inquiry centers, not on ownership of the delivery truck, but on allocation of responsibility for ensuring the out-of-state delivery. Here, Neiman Marcus assumed full responsibility for insuring the goods to be delivered. Neiman Marcus contracted with the carrier itself with no involvement whatsoever from the purchaser or her designee. Consistent with its standard of superior customer service, Neiman Marcus invariably offered to the purchaser the choice between a refund or replacement whenever the purchaser reported the item had been damaged or lost in transit. Neiman Marcus's responsibility for delivery of the goods at destination was in no way qualified either by the sales receipt, signs posted at Neiman Marcus, or any other device. As a result, an oral contract based on course of dealing and usage of trade arose between Neiman Marcus and its customers, such that Neiman Marcus would not "complete his performance with reference to physical delivery of the goods" unless and until the customer, who "is always right" according to Neiman Marcus, was satisfied with delivery of the goods to their final destination. When such destination was out-of-state, title did not pass, and thus the sale was not taxable, within the Commonwealth. Cf. Droukas, 375 Mass. at 158-59 (title passed in Massachusetts when seller delivered goods to common carrier, where no evidence that seller retained any other responsibility for their delivery).

Based on the foregoing, the Board found that the sales for out-of-state delivery at Neiman Marcus, both the send and gift-send transactions, were not subject to Massachusetts sales tax. Therefore, Neiman Marcus is entitled to an abatement of the sales tax it paid on send and gift-send transactions during the periods at issue.

Accordingly, the Board issued a decision for the appellant and granted an abatement of $142,714.47, plus statutory additions.

By: Abigail A. Burns

DJ1 Chairman
2001 WL 1590444 (Mass.App.Tax.Bd.)
END OF DOCUMENT